IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE KOSTELAC, | ) | Case No. 1:17-cv-02114 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, George Kostelac, seeks judicial review, pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), of the final decision of the Commissioner of Social Security ("Commissioner")

denying his application for Disability and Disability Insurance Benefits ("DIB") under Title II of

the Social Security Act ("Act").  Because substantial evidence supported the ALJ's RFC

determination, I recommend that the final decision of the Commissioner be AFFIRMED.

## II.      Procedural History

Kostelac applied for Disability and DIB on June 17, 2014 (Tr.23) alleging a disability

onset date of March 30, 2007.  (*Id.*)  Kostelac alleged disability due to the following conditions:

a fracture of the navicular wrist bone, sprain of the right wrist, contusion of the right wrist,

internal derangement of the left knee, torn meniscus, carpal tunnel syndrome, osteoarthritis of the

left leg, and post-traumatic arthritis of the right knee.  (Tr. 27, 219)  Kostelac's application was

denied initially on November 26, 2014, and on reconsideration on January 12, 2015.  (Tr. 23)

Thereafter, Kostelac filed a written request for rehearing on February 13, 2015.  (*Id.*)

Administrative Law Judge ("ALJ") Catherine Ma heard the case on May 20, 2016 (Tr. 35) and

denied Kostelac's claim on July 12, 2016.  (Tr. 20)  The Appeals Council denied further review

on August 10, 2017, rendering the ALJ's decision the final decision of the Commissioner.

### III.    Evidence

Kostelac now raises one argument: the ALJ erred when she found that his impairments

did not meet the criteria of Listing 1.02, which concerns major dysfunction of certain joints.  *See*

ECF Doc. 12, Page ID# 1228.  Because the issue is limited, it is not necessary to summarize the

entire record.

### A.    Personal, Educational, and Vocational Evidence

Kostelac was 38 years old on his alleged onset date, and had turned 49 by the time of the

hearing.  (Tr. 89, 42)  Kostelac was 45 years old on the date last insured.  (Tr. 89)  Kostelac

graduated from high school and completed some college courses.  (Tr. 389, 536)  Kostelac also

completed a course for wastewater treatment plant operation.  (Tr. 536)  Kostelac indicated past

work in demolition and as a driver, sales representative, truck driver, and warehouse worker.

(Tr. 27)  He alleged disability due to a fracture of the navicular bone in his wrist, sprain of the

right wrist, contusion of the right wrist, internal derangement of the left knee, torn meniscus,

carpal tunnel syndrome, osteoarthritis of the left leg, and post-traumatic arthritis of the right

knee.  (Tr. 27, 219)

I will focus my discussion of the medical record on the evidence relating to Kostelac's

argument that his knee impairment meets or medically equals the requirements of Listing 1.02.

The discussion will also focus on the relevant period, namely the alleged amended onset date of

March 30, 2007 through the date Kostelac was last insured, December 31, 2012.  (Tr. 25)

**B.      Medical Records Related to Kostelac's Knees and Legs**

On December 8, 2005, Kostelac injured his knee at work.  (Tr. 377)  After slipping on ice, he hurt his knee, and suffered injuries to his right wrist and right shoulder.  (Tr. 527)  He tore the medial meniscus in the left knee and suffered an articular cartilage contusion.  (*Id.*)

On July 19, 2006, Mark A Panigutti, M.D., submitted a letter stating that Kostelac reported worsening pain and an inability to walk on one occasion.  (Tr. 379)  On examination, Dr. Panigutti found Kostelac had a very large knee, with no obvious instability.  (*Id.*)  Kostelac had mild lateral joint line tenderness, no medial joint line tenderness, no obvious pivot shift, and good motor and sensory function distally.  (Tr. 379)  Dr. Panigutti found Kostelac had no obvious fracture or misalignment and adequate preservation of the non-weight bearing joint spaces.  (*Id.*)  Dr. Panigutti recommended a cortisone injection and MRI, and stated that it would be fine to proceed with surgery if Kostelac's MRI was "okay."  (*Id.*)

On August 4, 2006, Dr. Panigutti performed a diagnostic arthroscopy on Kostelac's knee(s).  (Tr. 382)  Kostelac reported recurrent significant knee pain and symptoms of catching and locking, despite his having undergone conservative care, including cortisone injections and a course of rest.  (*Id.*)  An MRI of Kostelac's knee "did not show a lot of significant findings." (*Id.*)  But Dr. Panigutti found significant lateral gutter and suprapatellar pouch synovitis.  (*Id.*) Kostelac's ACL was stable, with a moderate amount of synovium.  (*Id.*)  Much of the synovium from the ligamentum and mucosa was gently debrided.  (*Id.*)  The patellofemoral region showed lateral tracking and the patellofemoral region, anteromedial femoral condyle showed grade II and III chondromalacia.  (*Id.*)  Dr. Panigutti debrided a 5-8 mm unstable flap and a radial tear in the posterior horn of the medial meniscus to a stable pattern.  (*Id.*)  The other results were normal. (*Id.*)

3

On January 10, 2007, Kostelac reported to Dr. Panigutti that he experienced pain in the patellofemoral area of his knees when he squatted or kneeled.  (Tr. 591)  On examination, Dr. Panigutti found no effusion, mild medial patellofemoral facet tenderness, no medial or lateral joint line tenderness, and no obvious instability.  (*Id.*)  Dr. Panigutti recommended treatment with anti-inflammatories before Kostelac received cortisone injections.  (*Id.*)  On February 2, 2007, Kostelac reported to Dr. Michael W. Keith avocational activities including softball and yardwork.  (Tr. 433)

On May 16 and 18, 2007, Mary Pettit performed a vocational evaluation.  (Tr. 388) Kostelac told her that he enjoyed gardening and working out in his free time.  (*Id.*)  He reported that he could not kneel and experienced some pain with extended walking and/or standing.  (Tr. 388)  Kostelac rated his pain as a 5 on a 10 scale.  (*Id.*)

On June 20, 2007, Kostelac complained of knee pain to Dr. Panigutti.  (Tr. 377, 859)  Dr. Panigutti diagnosed right knee derangement and a meniscus tear.  (*Id.*)  Dr. Panigutti noted that Kostelac needed a meniscectomy and found that he had a good prognosis for improvement although problems still persisted.  (*Id.*)

Kostelac underwent physical therapy for his wrists from June 27, 2007 to August 10, 2007.  (Tr. 628-41, 657-77)  Kostelac reported that he was independent with activities of daily living, although he had difficulty with heavy lifting at home.  (Tr. 367)  His exercises included pushing and/or pulling an empty sled with 15 pounds of force for 192 feet, carrying a 15 pound box for 192 feet, and/or lifting a 17.5 pound wooden box from the floor to his waist and from his waist to his shoulder.  (Tr. 631, 635, 639)

On November 2, 2007, Dr. Panigutti evaluated Kostelac's knees.  (Tr. 267)  Kostelac reported that he had been doing a lot of walking and a little bit of kneeling and squatting.  (*Id.*)

Examination revealed mild facet tenderness about the patella, but no instability or joint line tenderness.  (*Id.*)  X-rays showed mild to moderate patellofemoral degenerative changes and mild to moderate medial knee degenerative changes.  (*Id.*)  Dr. Panigutti assessed articular cartilage flare and recommended a cortisone injection and prescribed myoderm patches.  (*Id.*)

In March 2008, Dr. Panigutti evaluated Kostelac's knee.  (Tr. 852)  Kostelac reported that his knee had started to bother him "intermittently," but that it was nothing like the severe locking and swelling he had experienced earlier.  (*Id.*)  Kostelac asked whether he could get a new job and reported that he was doing well losing weight.  (*Id.*)  Kostelac had no effusion and good motion, although he still had some tenderness medially and in the patellofemoral area.  (Tr. 852)  Dr. Panigutti recommended conservative care, including intermittent cortisone injections.  (*Id.*)

On April 30, 2008, Dr. Panigutti evaluated Kostelac's knee pain.  (Tr. 846)  Dr. Panigutti opined that Kostelac had a good prognosis for improvement and was able to perform regular job duties.  (Tr. 846)

On June 6, 2008, Kostelac reported to Mary Pettit in a vocational services appointment that he had done multiple interviews with employers for water treatment operator and utility operator positions.  (Tr. 844)

In an occupational therapy appointment in August 2008, Kostelac reported that he was independent with activities of daily living, but required additional time for activities with his right hand.  (Tr. 619)

Kostelac underwent occupational therapy in October and November 2008.  (Tr. 549, 555, 558, 561, 686-707)  Kostelac was able to lift 16 or 19 pounds to waist level and carry the weight for 100 feet twice.  (Tr. 549, 558, 561, 702, 705)  Kostelac stated that he had been using his hands a lot in the yard and, on one occasion, indicated that his hands were sore from working in

the yard. (Tr. 555, 690) He also stated that he had gone through a 26 week job training program for waste water treatment and planned to take a test at the end of October 2008. (Tr. 687) He reported that he was independent with activities of daily living and independent with household activities. (Tr. 687) He stated that his avocational activities included gardening and fishing. (*Id.*)

On November 12 and 13, 2008, Kostelac underwent a comprehensive work hardening evaluation that focused mostly on the condition of his right wrist. (Tr. 533) Jan Hornack, PT, Kimberly Sewall, MS, OTR/L and Diane Zrenner Med, CRC, LPC contributed to the evaluation. (Tr. 540) The reviewers found that Kostelac was independent with his activities of daily living. (Tr. 534) In relevant part, Kostelac reported that he could stand for 1-2 hours and walk for 0-1 hours, but the reviewers opined that Kostelac could walk or stand for "2+" hours. (Tr. 535) The reviewers opined that Kostelac could lift a maximum of 40-50 pounds occasionally, not repetitively, and could push or pull about 20 pounds. (*Id.*) The reviewers opined that Kostelac could: occasionally engage in stooping, half-kneeling, kneeling, or climbing stairs; never engage in crouching, crawling, or jumping; and could frequently engage in fingering, handling, or measuring. (Tr. 535-36) The reviewers opined that Kostelac could perform work at the light exertional level. (Tr. 536) Kostelac reported that his leisure activities included gardening, outdoor chores, and working out. (*Id.*) The reviewers opined that Kostelac's lower extremities were within functional limits, with intact sensation. (Tr. 537)

Kostelac's work hardening therapy included lifting a wooding a wooden box and carrying it 172 feet, pushing a sled 172 feet, and carrying a bucket with both hands. (Tr. 543, 725) Kostelac rated his overall pain as a 3 on a 10 scale, his left knee pain as 2-5/10, and his right gluteal pain as 4/10. (Tr. 541) Kostelac was able to walk on a treadmill for 25-40 minutes, at a

peak speed that ranged from 1.6 to 2.0 miles per hour, and Kostelac only reported a pain level of 4 out of 10.  (Tr. 530, 544, 720)  Kostelac cancelled his work hardening therapy on November 21, 2008 so that he could attend a job interview.  (Tr. 545)  Kostelac also stated that his knee pain decreased from 4/10 to 0/10 after he received a cortisone shot.  (Tr. 723)

On December 8, 2008, Dr. Keith opined that after Kostelac finished his work hardening program, he had "reached a level of appropriate restriction that allows him to participate in a job search."  (Tr. 678)  In February 2009, Dr. Keith stated that Kostelac had "largely made a recovery at this point" and that "[a]ll he needs is a job."  (Tr. 758)

On February 18, 2009, Kostelac reported to Dr. Panigutti that he was having some pain and would like an injection, but Dr. Panigutti stated that it was too early compared to the last injection.  (Tr. 761)  Dr. Panigutti and Kostelac discussed what kinds of jobs Kostelac could perform.  (*Id.*)  Dr. Panigutti advised that Kostelac avoid heavy squatting, kneeling, lunging, and climbing jobs, but stated that Kostelac "really has no restrictions" and should "let pain be his guide."  (*Id.*)  They also discussed a conservative care plan.  (*Id.*)

On May 26, 2009, Kostelac received job placement assistance from vocational services provider Dianne Zrenner M.Ed., LPC, CRC.  (Tr. 751-52)  Ms. Zrenner noted that Kostelac had improved his tolerances for medium level work.  (Tr. 751)  She also noted that Kostelac did not pass his certification test to become a wastewater treatment plant operator, but would pursue truck driving, warehouse, and building maintenance jobs at the medium work level.  (*Id.*)

On July 17, 2009, Kostelac reported to Dr. Panigutti that the patellofemoral area of his knee was bothering him and slowed him down when performing heavier activities.  (Tr. 746) Dr. Panigutti found Kostelac was tender about the patellofemoral region and medial joint line.

(*Id.*)  He recommended a cortisone injection and injected Marcaine and Kenalog into Kostelac's knee.  (*Id.*)

On December 7, 2009, Dr. Panigutti found significant degenerative joint disease ("DJD") of the knee, small effusion and mild tenderness, but no signs of infection.  (Tr. 730)  Dr. Panigutti injected Marcaine and Kenalog into Kostelac's knee.  (*Id.*)

On January 25, 2010, Kostelac complained of knee pain.  (Tr. 728)  Dr. Panigutti found continued knee pain and swelling, but noted a good prognosis for improvement.  (*Id.*)  On examination, Kostelac's knee was tender medially, but there was no instability or effusion.  (*Id.*)  X-rays showed essentially bone on bone wear of the medial aspect of the left knee, but no sign of facture.  (Tr. 728-29)  Dr. Panigutti noted that Kostelac was still experiencing degenerative changes and intermittent symptoms three years after his meniscectomy.  (Tr. 728)  Dr. Panigutti instructed Kostelac to lose weight.  (*Id.*)  X-ray images taken that day showed essentially bone on bone wear of the medial aspect of the left knee, but no obvious signs of fracture.  (Tr. 734)  In April 2010, Kostelac received a series of three OrthoVisc injections.  (Tr. 359, 363, 366)

On October 11, 2010, Dr. Panigutti noted that there was no change in Kostelac's physical capacities and that Kostelac was still searching for a job.  (Tr. 358)

Dr. Panigutti evaluated Kostelac's knee pain several times between November 10, 2010 and October 7, 2011.  (Tr. 337, 352)  Kostelac complained of increased knee pain.  (Tr. 337)  He reported that his knee bothered him, mostly anteriorly, especially when he climbed ladders.  (Tr. 352)  On examination he had no effusion and moved relatively well, despite his large size.  (Tr. 352)  Dr. Panigutti noted that Kostelac has lost 40 pounds and was down from 390 to 350 pounds.  (Tr. 337)  Standing PA knee films showed moderate wear of the medial joint space on the left, moderate patellofemoral DJD, and no signs of fracture.  (Tr. 337)  Dr. Panigutti opined

8

that Kostelac likely had an articular cartilage flare.  (Tr. 352)  Dr. Panigutti recommended a cortisone injection and injected Marcaine and Kenalog into Kostelac's knees.  (Tr. 352)  He also found Kostelac would be a good candidate for gel shots and recommended a series of OrthoVisc injections.  (Tr. 337)

In October 2011, Kostelac complained to Dr. Keith of right ankle pain after his back surgery and lateral leg weakness.  (Tr. 490)  Dr. Keith found that Kostelac could benefit from a metal ankle brace with a T-strap to help control the deformity in his ankle.  (*Id.*)

On August 29, 2012, John K. Sontich, M.D. saw Kostelac regarding his knee pain.  (Tr. 481, 527)  Dr. Sontich noted that Kostelac's right knee, which had been his main stabilizer, was failing.  (Tr. 482, 527)  Dr. Sontich noted Kostelac had pain along the medial joint line of his right knee.  (Tr. 537)  Dr. Sontich opined that Kostelac had essentially gone through all conservative treatment for his left knee and was disabled from his job.  (*Id.*)  Kostelac weighed 375 pounds.  (*Id.*)  On examination Dr. Sontich found Kostelac walked with an extraordinarily slow gait and had pain with every step.  (Tr. 528)  Dr. Sontich found Kostelac's legs were in obvious varus, with the left worse than the right.  (*Id.*)  Kostelac's knee had tenderness along the entire medial joint line with crepitus of the patella.  (*Id.*)  He lacked approximately 2 degrees of full extension and flexed to almost 95-100 degrees.  (*Id.*)  Kostelac had 5/5 motor strength.  (*Id.*)  Kostelac had full extension of his right knee and 100 degrees of flexion.  (*Id.*)  X-rays showed severe medial joint space bone-on-bone apposition of the left, and almost bone-on-bone apposition of the right knee.  (*Id.*)  Dr. Sontich found Kostelac had severe varus alignment in his lower extremities, with a 6 cm medial axis derivation of the left knee and a 5 cm medial axis derivation of the right knee.  (*Id.*)

Dr. Sontich diagnosed Kostelac with medial meniscus and articular cartilage injury along the medial knee joint, which led to posttraumatic arthritis and varus alignment of the right leg. (*Id.*)  He also assessed secondary degenerative changes to Kostelac's right knee caused by overload from obesity and Kostelac's inability to fully bear weight on his left leg.  (Tr. 529)  Dr. Sontich diagnosed early instability of the right ankle, second to the varus alignment of the right lower leg and morbid obesity.  (*Id.*)

Dr. Sontich recommended a left high tibial osteotomy, fibular osteotomy, and correction of his mechanical axis.  (*Id.*)  Dr. Sontich opined that Kostelac would likely require at least two rings at certain places in his tibia due to his size.  (*Id.*)

In February 2013, Dr. Sontich found that Kostelac's left leg was significantly more edematous than his right, potentially because his arthritis was worse on that side.  (Tr. 928)  Kostelac's range of motion was 5 degrees short of full extension, and he flexed to about 95 degrees on the left.  (*Id.*)  Dr. Sontich diagnosed Kostelac with osteoarthritis of the left knee. (*Id.*)  Kostelac expressed his desire to proceed with a left Taylor Spatial Frame.  (*Id.*)  Dr. Sontich stated that they needed to obtain an ultrasound of Kostelac's left leg.  (*Id.*)  In relevant part, Dr. Sontich diagnosed Kostelac with a tear of the medial meniscus of the knee, other internal derangement of knee, and secondary localized osteoarthritis in the lower leg.  (Tr. 929)

C.      **Opinion Evidence**

1.      **Dr. Michael W. Keith – Treating Physician**

On April 12, 2010, Michael W. Keith M.D. issued a medical report as part of Kostelac's application for wage loss compensation.  (Tr. 365)  Dr. Keith opined that Kostelac could sit, stand, and/or walk for eight hours in an eight-hour workday.  (*Id.*)  Dr. Keith opined that Kostelac could frequently bend, squat, crawl, or climb and could occasionally reach.  (*Id.*)  He

10

opined that Kostelac could lift and/or carry 5-10 pounds frequently, 11-20 pounds occasionally, and could never lift or carry 21 or more pounds.  (*Id.*)  Dr. Keith opined that Kostelac could use both hands in repetitive actions such as simple grasping, pushing and pulling arm controls, and fine manipulation.  (*Id.*)  Dr. Keith also opined that Kostelac could use both feet in repetitive movements of leg controls.  (*Id.*)

On October 4, 2012, Dr. Keith completed a second assessment of Kostelac's physical capacity in conjunction with Kostelac's worker compensation claims.  (Tr. 502)  Dr. Keith's assessment was the same as his prior assessment dated April 12, 2010, except, Dr. Keith found Kostelac could climb only occasionally, rather than frequently.  (*Id.*)

### 2.  State Agency Reviewing Physicians - Elizabeth Das, M.D., Abraham Mikalov, M.D.

On November 26, 2014, Elizabeth Das, M.D. issued an assessment of Kostelac's residual functional capacity.  (Tr. 82-87)  Dr. Das considered Listing 1.02, dysfunction of major joints. (Tr. 82)  Dr. Das found Kostelac's statements regarding his symptoms, in light of the total medical and non-medical evidence in file, were partially credible.  (Tr. 83)  Dr. Das opined that the medical evidence showed Kostelac had some health issues, but that the alleged severity was not supported.  (*Id.*)

Dr. Das opined that Kostelac could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  (Tr. 84)  She opined Kostelac could stand or walk for two hours and sit for about six hours in an eight-hour work day.  (*Id.*)  She opined Kostelac's ability to push and/or pull was limited in both of his lower extremities.  (*Id.*)  Dr. Das opined Kostelac could: occasionally engage in climbing ramps or stairs and crouching; never engage in climbing ladders, ropes, and scaffolds, kneeling, or crawling; and engage in unlimited balancing or stooping.  (*Id.*)  She stated that her opinions regarding Kostelac's exertional limitations were

supported by a 2006 MRI of Kostelac's left knee that showed small joint effusion and by x-rays of both knees, ankles, and hips from August of 2012 that showed narrowing of medial compartments and bilateral bowing in the lower extremities.  (*Id.*)  Dr. Das opined that Kostelac could engage in unlimited reaching in any direction and limited handling, fingering, or feeling on the right side.  (Tr. 84-85)  She found Kostelac did not have any visual, communicative, or environmental limitations.  (Tr. 85)

On January 10, 2015, state agency reviewing physician Abraham Mikalov, M.D. reached the same conclusions as Dr. Das regarding Kostelac's residual functional capacity.  (Tr. 93-95)

### D.  Testimonial Evidence

#### 1.  Claimant's Testimony

At the May 20, 2016 hearing, Kostelac testified he lived in a ranch-style house that had two stories, including a basement that contained his laundry facilities.  (Tr. 40, 42)  Kostelac stated that there are two steps in his house.  (Tr. 41)  He said he lives with his eighty-four year old mother, sister, and seven-year old German shepherd dog.  (Tr. 41-42)  Kostelac stated that he lost 80 pounds, but gained some weight back because of his second leg surgery.  (Tr. 45)  He weighed 320 pounds on the date of the hearing.  (*Id.*)

He stated he has a walker that he uses to move without his wheelchair and he would hop on his left leg, although it was "hurting pretty bad" then.  (Tr. 41)  He stated the arthritis in his hands prevented him from using crutches.  (*Id*.)  He stated that he went out "less than day two" because he was afraid to fall on ice or water due to an injury to his peroneal nerve that occurred when he fractured his leg.  (Tr. 40)  He testified he had only gone out three times since he underwent surgery on February 19, 2016 and was put in a cast.  (Tr. 44)  He stated his sister gave him a ride to the hearing.  (Tr. 44)

12

Kostelac stated he was 49-years-old.  (Tr. 42)  He had completed two years of college in a business management program of study and also attended community college classes, but did not obtain a degree.  (Tr. 42-43)  He had a valid Class A CDL special license.  (Tr. 43)  He stated he started as a helper with the teamsters when he was 17, progressed to being a driver, stayed for 18 years, and became a warehouse supervisor.  (Tr. 42)  Kostelac stated that after 18 years he moved and did demolition for about 18 months.  (*Id*.)  Kostelac stated that he was right-handed and was not able to drive at the time of the hearing.  (Tr. 43)

Kostelac testified that he last worked as a beer delivery driver for R. L. Lipton.  (Tr. 46)  In that position he stated he would spend approximately three hours sitting and five hours standing.  (Tr. 47)  He would lift 15 gallon kegs that weighed about 150 pounds and would carry up to ten normal cases of bear that weighed 25 to thirty pounds.  (Tr. 47)

He also worked for four to six months at in a warehouse job at Culligan Water where he unloaded and filled trucks.  (Tr. 48)  The job involved lifting and carrying.  (Tr. 49)  He spent about three hours sitting and five hours standing.  (*Id*.)  Kostelac also operated forklifts.  (Tr. 53)

Kostelac stated that he worked for Safeway Environmental Corporation and did demolition and tore down row houses.  (Tr. 49)  Kostelac stated that he stood most of the day while working in this position.  (Tr. 49)  He also had to lift items weighing 50-100 pounds.  (Tr. 50)

Kostelac stated he worked at Dominion Enterprises Auto Trader where he made Moroni stickers to be placed on used cars in dealer lots.  (Tr. 50)  The job involved a lot of walking and standing, but only the lifting of paper.  (Tr. 51)

13

Kostelac stated he worked at Advanced Communications where he ran a warehouse and passed out the cable boxes and equipment to installers.  (Tr. 51)  His work involved lifting up to 30 or 40 pounds and he was on his feet six hours in an eight-hour workday.  (Tr. 52)

Kostelac stated he worked for Pepsi as both a truck driver and warehouse manager.  (Tr. 52-53)  At Pepsi, Kostelac lifted cases weighing 25-30 pounds and  both sat and stood while getting into and out of a delivery truck; and he stood and walked around when he worked as a warehouse supervisor.  (Tr. 53)  He also operated forklifts.  (Tr. 54)

Kostelac testified that in 2005 he was injured when fell and hit both his knees while trying to open the door of a truck.  (Tr. 54-55)  He fractured his hand and then underwent a year and a half of minimally invasive procedures, including shots and therapy.  (Tr. 55)  He also wore a cast on his hand whenever his hand hurt for several months.  (*Id*.)  Kostelac had surgery on his hand; three pins were put in his hand, and he wore a cast for another six months.  (*Id*.)  Kostelac stated that he could not go back to his previous jobs because he was unable to do the required repetitive lifting and he noted he had "both the carpal tunnels and torn meniscus."  (*Id*.)  Rather, Kostelac was doing light duty work, like "office light duty," but the work did not go very well because he had to miss days for the surgeries and he had to go on FMLA on one occasion.  (Tr. 55-56)  Kostelac stated that he ended his job with his employer when they informed him on April 30, 2007 that if he failed to return to work the following day he would be terminated.  (Tr. 56)

Kostelac testified he could not do any type of full-time work because it is "hard to do computer or write" with his hand.  (Tr. 56)  He has "to have knee someday with the arthritis and everything" in his knees.  (Tr. 57)  He stated he has a hard time walking, standing, and sitting for a long time.  (*Id*.)  He stated his condition seemed to be getting worse.  (*Id*.)  He stated he could hardly walk and "even if [he] stepped on the smallest pebble, [his] foot would curve in so much

14

that it would just go out." (*Id.*)  He stated he was suffering from arthritis in his whole body. (*Id.*)  He stated that a doctor did osteotomies to his legs that put his legs straighter, took the pressure off his knees, and made it so that he "might not need the knees for a longer period of time." (*Id.*)  He stated he had his ankle repaired.  (*Id.*)  He stated he would never "have the strength on the outside of the foot" and opined that hopefully his foot would be straight when he walks.  (Tr. 57-58)  Kostelac stated that a psychologist diagnosed him with major depression, but that he had only attended a consultation and two appointments with the psychologist.  (Tr. 64)

The treatments Kostelac received for his knees included: cortisone shots every six months; repair of his torn meniscus; osteotomy; physical therapy; and surgery on his right knee and ankle.  (Tr. 59)  He indicated that he was using a wheelchair after his ankle surgery, but hoped to only be using it temporarily.  (*Id.*)  He stated that before 2012 he was taking Percocet, Vicodin, and other medications for his knee pain.  (Tr. 65)  Kostelac stated that at one point he was taking Percocet every four hours, but the medications failed to completely relieve the pain. (*Id.*)  He stated that the medications did "not really" cause any adverse side effects.  (Tr. 66)  He stated that he experienced swelling and constant stiffness in his knees and that the left one was worse than the right.  (*Id.*)  Kostelac stated that he would prop his legs up on pillows when he slept and would use ice for 15 minutes per knee to relieve the stiffness and swelling.  (*Id.*)

Kostelac indicated that after he stopped working for Lipton, he was not able to do many activities of daily living.  (Tr. 60)  He stated that he had very limited ability to shop for necessities when walking and could walk with a cane or walker and then a cart when shopping at certain stores.  (Tr. 60)  He stated he had trouble dressing himself, because he could not feel anything in his feet.  (*Id.*)  He also stated he had trouble entering and exiting the tub when bathing or showering.  (*Id.*)  He stated that he was unable to do household chores and that his 84-

15

year-old mother did the household chores, including the laundry, cooking, and grocery shopping.
(Tr. 60-61)  Kostelac stated he hired a service provider to handle the yard work at his home.  (Tr.
61)  His mother takes care of his dog.  (Tr. 62)  He stated he used the computer "on and off" but
was "not great with it," and he did not do any social networking.  (*Id.*)  Kostelac stated that he
used to drive and do his own shopping and laundry.  (Tr. 61)  He also stated he used to ride
motorcycles and cook "all the time," but could no longer do so.  (Tr. 62)  He stated he used to
like to do yard work.  (*Id.*)  He stated he watched more TV than he had ever watched in his
whole life.  (Tr. 63)  He stated he would go outside on his patio in his wheelchair.  (Tr. 63)  He
stated that before he had surgery, he would have trouble driving.  (Tr. 64)  He stated that his pain
affected his sleep and that he would need to elevate his legs and hands.  (Tr. 66-67)

Kostelac stated that he used a TENS unit on his knees between one and a half and two
hours per day and "iced [his] legs down."  (Tr. 63)  He stated that when he was able to walk, he
would try to go to aqua therapy two to three times a week and that the therapy helped his
condition.  (Tr. 60, 63)  He stated that in 2012 he could not walk far without a cane or walker.
(Tr. 67)  He said that he would take "baby steps" and shuffle a lot.  (*Id.*)  He stated that he did
not fall again after his original fall.  (Tr. 67-68)  He stated he must wear boots, because he cannot
wear shoes, in part due to problems with his ankle.  (Tr. 68)  Kostelac stated he used a cane
because "it matches my shoes."  (*Id.*)

## 2.      Vocational Expert Testimony

Vocational expert ("VE") Ted S. Macy also testified.  (Tr. 69)  In relevant part, the ALJ
asked the VE to characterize Kostelac's past work.  (Tr. 70)  The VE stated that Kostelac has
worked as a delivery driver in positions that were very heavy and medium to very heavy,
demolition worker, material handler, ticket/label maker, and warehouse supervisor.  (Tr. 70-71)

16

The ALJ asked the VE what jobs an individual who was able or unable to perform the following limitations could do: lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for two hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; never kneel or crawl; occasionally crouch; and have occasional right handling, fingering, and feeling. (Tr. 71)  The VE opined that an individual with the limitations described in the ALJ's hypothetical could work in a table worker, final assembler, or bonder position.  (Tr. 73-74)

Kostelac's attorney then asked whether the hypothetical worker from the ALJ's hypothetical question could do the same jobs if the dominant right hand were able to be used occasionally while the left hand could be used frequently.  (Tr. 75)  The VE testified that there were no jobs the individual with those additional limitations could do.  (*Id.*)

## IV.  Standard of Review and Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy1....

42 U.S.C. § 423(d)(2)(A).

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow the five-step sequential analysis set out in agency regulations, which can be paraphrased as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's RFC and use it to determine whether claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on her vocational factors and RFC, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision.");  *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been

defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994)).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-73 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999); *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied.  If not, reversal is required, unless the error of law was harmless.  *See, e.g. White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.

1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich.

Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was

discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS

141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist.

LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S.

Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

## V.     The ALJ's Decision

The ALJ's July 12, 2016 decision contained the following findings relevant to Kostelac's appeal:

1. Kostelac last met the insured status requirements of the Social Security Act on December 31, 2012.  (Tr. 25);

2. Kostelac did not engage in substantial gainful activity during the period from his alleged amended onset date of March 30, 2007 through his date last insured of December 31, 2012 (20 C.F.R. § 404.1571 *et seq*.).  (Tr. 25);

3. Through the date last insured, Kostelac had the following severe impairments: osteoarthritis and allied disorders; and carpal tunnel syndrome (20 C.F.R. § 404.1520(c)).  (Tr. 25);

4. Through the date last insured, Kostelac did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).  (*Id.*);

5. After careful consideration of the entire record, the ALJ found that, through the date last insured, Kostelac had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following additional limitations: Kostelac can lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand/walk for 2 hours and sit for 6 hours in an 8-hour workday. Kostelac should never climb ladders, ropes, or scaffolds, crawl, or kneel; and could occasionally climb ramps and stairs, and crouch.  He can occasionally handle, finger, and feel with the right upper extremity.  (Tr. 26);;

10. Through the dated last insured, considering the Kostelac's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Kostelac could have performed (20 C.F.R. §§ 404.1569 and 404.1569(a)).  (*Id.*);

The ALJ determined that Kostelac was not disabled between March 30, 2007, the alleged

onset date, through December 31, 2012, the date last insured.  (Tr. 32)

## VI.    Law & Analysis

### A.    The ALJ Properly Evaluated Kostelac's Physical Condition under Listing 1.02

Kostelac argues that his impairments satisfy Listing 1.02.  *See* ECF Doc. 12, Page ID# 1228.  Kostelac does not argue that his impairments cause an inability to perform fine and gross movements effectively, within the meaning of the Listings, so it is unnecessary to address Listing 1.02(B).  Rather, Kostelac focuses on Listing 1.02(A).

The Listing of impairments "describes, for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity."  20 C.F.R. § 404.1525.  A claimant's impairment must meet every element of a listing before the Commissioner may conclude that he or she is disabled at Step Three.  *See* 20 C.F.R. § 404.1520; *see also Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir.1986).  The claimant has the burden to prove that all of the elements are satisfied.  *King v. Sec'y of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir.1984).  The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner."  20 C.F.R. § 404.1526(c).  Nevertheless, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant."  *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir.1986).  The court may look to the ALJ's decision in its entirety to justify the ALJ's Step Three analysis.  *See Snoke v. Astrue*, 10-cv-1178, 2012 U.S. Dist. LEXIS 21930, 2012 WL 568986, at *6 (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)).  It is not

21

sufficient to come close to meeting the conditions of a Listing.  *See, e.g., Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir.1989) (Commissioner's decision affirmed where medical evidence "almost establishes a disability" under Listing).

In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision.  *See e.g. Reynolds*, 2011 WL 1228165 at * 4–5; *Keyes v. Astrue*, 1:11-cv-00312, 2012 WL 832576 at * 5–6 (N.D. Ohio March 12, 2012).

Listing § 1.02(A) provides for a finding of disability when a claimant suffers from major dysfunction of a joint due to any cause

> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankyloses, instability), and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankyloses of the affected joint(s) with
>
> A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpt. P, App. 1, § 1.01(A).  The Regulations define an inability to ambulate effectively as an:

> Extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (*see* 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.  (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.).
>
> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as

22

shopping and banking, and the inability to climb a few steps at a reasonable pace
with the use of a single hand rail.  The ability to walk independently about one's
home without the use of assistive devices does not, in and of itself, constitute
effective ambulation.

20 C.F.R. Part 404, Subpt. P, App. 1, § 100(B)(2)(b)(1) and (2).

Here, the ALJ's analysis regarding Listing 1.02 was as follows:

The claimant's impairments failed to meet the listing for 1.02 (Major dysfunction of a
joint), because the record, consistent with the findings below, does not demonstrate gross
anatomical deformity and chronic joint pain and stiffness with signs of limitation of
motion or other abnormal motion of the affected joint(s), and findings on imaging studies
of joint narrowing, bony destruction, or ankylosis of the affected joint(s), with:
involvement of one major peripheral weight-bearing joint (I.e. hip, knee, or ankle),
resulting in inability to ambulate effectively or involvement of one major peripheral
weight-bearing joint resulting in inability to ambulate effectively. (see 20 CFR Part 404
Subpart P, Appendix 1, § 1.02)

(Tr. 25-26)

Kostelac argues that the ALJ failed to discuss the evidence in the record that pertains to

Listing 1.02 and that it is unclear which of Listing 1.02's requirements Kostelac's condition fails

to meet.  *See* ECF Doc. 12, Page ID# 1229.  The Commissioner counters that Kostelac's

contention is without merit because "[w]hile the ALJ's discussion at Step Three of her decision

was admittedly brief, she discussed the evidence pertaining to listing 1.02 in her subsequent

discussion of [Kostelac's] residual functional capacity."  *See* ECF Doc. 13, Page ID# 1244

(citing Tr. 25-30).

Kostelac points to several examples of evidence he argues the ALJ failed to consider that

allegedly show that he has major dysfunction of a joint due to a cause characterized by a gross

anatomical deformity, such as subluxation, contracture, bony or fibrous ankyloses, or instability.

However, the ALJ's decision indicates that she considered this evidence or other evidence

showing similar information regarding Kostelac's condition.  Further, as the Commissioner

correctly notes, an ALJ's discussion at other steps in the sequential analysis may provide the

23

necessary support for her conclusions at Step Three.  *See* ECF Doc. 13, Page ID# 1245 (citing

*Smith-Johnson v. Comm'r of Soc. Sec*., 579 F. App'x 426, 435 (6th Cir. 2014)); *see also Bledsoe*

*v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding that the ALJ appropriately

considered a claimant's combined impairments at Step Three in part because he "described

evidence pertaining to all impairments, both severe and nonsevere, for five pages earlier in his

opinion and made factual findings").  In her residual function capacity analysis, the ALJ stated

the following regarding the evidence relating to Kostelac's knees:

> Medical records also reflect the claimant's history of knee osteoarthritis as noted in
> diagnostic studies (*see* [Tr. 404]), and prior left knee arthroscopy in August 2006 ([Tr.
> 415, 480, 858]).  Despite surgical intervention, the claimant reported progressive pain;
> specifically, noting knee pain when climbing ladders ([Tr. 354, 481]).  June 2007
> progress notes indicate the claimant endorsed occasional knee pain and that he did well
> after debridement ([Tr. 268]).  However, physical examinations showed continued knee
> pain and swelling, a slow gait, and mild patellofemoral tenderness, and further noted the
> claimant moved relatively well with adequate hip range of motion and ambulated without
> the use of an assistive device ([Tr. 272, 345, 354, 482, 508, 516, 528]).  Similarly, an
> occupational therapy assessment revealed the claimant's range of motion and strength
> was within functional limits throughout the bilateral lower extremities, with intact
> sensation and coordination ([Tr. 537]).  June 2011 standing x-rays showed moderate wear
> of the medial joint space with no signs of fracture and moderate patellofemoral
> degenerative joint disease ([Tr. 338, 344]).  Following review of the claimant's objective
> findings, OrthoVisc injections were recommended to further manage the claimant's left
> knee and the claimant complied with treatment, presenting for three injections ([Tr. 340-
> 343, 359]).  X-rays lateral bowing of the lower extremities, and degenerative changes of
> the knees, specifically severe medial joint space bone-on-bone apposition of the left, and
> almost bone-on-bone apposition of the right knee; severe varus alignment in the lower
> extremities with a 6-6 cm medial axis deviation of the left knee, and a 5 cm medial axis
> deviation of the right knee; severe joint space narrowing bilaterally at the knees, and hip,
> but the AP hip did not reveal severe arthritis of the hips ([Tr. 318, 483]).  Following
> review of the images, surgical options were discussed with the claimant, but considering
> his age, weight, and physical activity, the claimant's physician noted knee replacements
> were not a good choice, but a left Taylor Spatial Frame was recommended ([Tr. 484,
> 928]).

(Tr. 27-28)

Kostelac argues the ALJ did not consider several medical records, including x-rays,

which showed patellofemoral degenerative changes, degenerative joint disease, "small effusion,"

mild tenderness, and "wear of the medial joint and patellar DJD."  *See* ECF Doc. 12, Page ID#

1229-30 (citing Tr. 267, 337-338, 730)  The ALJ did not explicitly discuss the medical records

Kostelac cites, but she noted "June 2011 standing x-rays showed moderate wear of the medial

joint space with no signs of fracture and moderate patellofemoral degenerative joint disease."

(Tr. 28 (citing Tr. 338, 344))  She further noted that "physical examinations showed continued

knee pain and swelling, a slow gait, and mild patellofemoral tenderness."  (*Id.*)  Kostelac cites an

x-ray that showed bone on bone wear in his left knee.  *See* ECF Doc. 12, Page ID# 1229 (citing

Tr. 728).  The ALJ noted that x-rays showed "degenerative changes of the knees, specifically

severe medial joint space bone-on-bone apposition on the left and almost bone-on-bone

apposition of the right knee."  (Tr. 28 (citing Tr. 318, 483))  Kostelac cites a medical record

prepared by Dr. Sontich in which he described varus in the left and right legs and slight varus in

his right ankle, and he noted that x-rays Kostelac brought in showed medial joint space bone-on-

bone apposition on the left, almost bone-on-bone apposition of the right knee, and severe joint

space narrowing bilaterally at the knees and hip.  *See* ECF Doc. 12, Page ID# 1230 (citing Tr.

482-83).  The ALJ explicitly discussed these medical record and noted that x-rays showed

"severe medial joint space bone-on-bone apposition of the left, and almost bone-on-bone

apposition of the right knee; severe varus alignment in the lower extremities with a 6-6 cm

medial[] axis deviation of the left knee, and a 5 cm medial axis deviation of the right knee;

severe joint space narrowing bilaterally at the knees, and hip."  (Tr. 28 (citing Tr. 482-83))

Kostelac also argues that medical records show he complained of knee pain "on almost

every visit."  *See* ECF Doc. 12, Page ID# 1230 (citing Tr. 338, 352, 382, 728).  Kostelac also

argues that he testified that his "daily chronic pain affected his sleep" and that he has "persistent

stiffness in his knee."  ECF Doc. 12, Page ID# 1231 (citing Tr. 62-63).  The ALJ explicitly

addressed Kostelac's complaints of pain and noted that "[d]espite surgical intervention, the claimant reported progressive pain; specifically, noting knee pain when climbing ladders."  (Tr. 27 (citing Tr. 354, 481))  The ALJ further noted that Kostelac "endorsed occasional knee pain and that he did well after debridement."  (Tr. 28 (citing Tr. 268))  The ALJ also noted that Kostelac testified at the administrative hearing that "he was unable to work due to pain in his hands and knees, as well as swelling."  (Tr. 27)

The ALJ discussed and considered the evidence Kostelac cites regarding his alleged "signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankyloses of the affected joint(s)" as discussed above.

The ALJ concluded that although Kostelac's "diagnostic studies were consistent with . . . moderate degenerative disc disease ([Tr. 237, 373]), and objective exams showed some decreased strength and range of motion in the knees and hands, with mild knee tenderness ([Tr. 471 and 537])," Kostelac's condition did not meet the requirements of Listing 1.02 because he still "was able to ambulate well."  (Tr. 28)  Listing 1.02(A) include as an element the "inability to ambulate effectively," which the regulations define, in relevant part, as "an extreme limitation of the ability to walk."  20 C.F.R. Part 404, Subpt. P, App. 1, §§ 1.01(A) and 1.00B2b(1), *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).  "An individual cannot ambulate effectively if, for example, he is unable to walk 'without the use of a walker, two crutches[,] or two canes' or 'carry out routine ambulatory activities, such as shopping and banking.'"  *See Forrest*, 591 F. App'x at 366 (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, §1.00B2b(2)).  Kostelac must also show that his inability to ambulate lasted for at least twelve months.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §1.00B2a.  Here, the ALJ's factual findings

26

support the conclusion that Kostelac could "ambulate effectively" for most of the relevant period.

The ALJ found that Kostelac admitted to having abilities consisted with the assessments of the state agency reviewing physicians Drs. Das and Mikalov, to which the ALJ gave great weight.  (Tr. 28)  In relevant part, Drs. Das and Mikalov opined that Kostelac could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  (Tr. 84, 93-94)  They also opined Kostelac could stand or walk for two hours and he could: occasionally engage in climbing ramps or stairs and crouching; never engage in climbing ladders, ropes, and scaffolds, kneeling, or crawling; and engage in unlimited balancing or stooping.  (Tr. 84, 94)  They stated that their opinions regarding Kostelac's exertional limitations were supported by a 2006 MRI of Kostelac's left knee that showed small joint effusion and by x-rays of both knees, ankles, and hips from August 2012 that showed narrowing of medial compartments and bilateral bowing in the lower extremities.  (Tr. 84, 94)

The ALJ also noted that Kostelac "engaged in a somewhat normal level of daily activity and interaction during the relevant period," that included the following activities of daily living: managing personal care needs, hunting, assisting with means, occasional shopping trips, walking his dog, riding his bike, and using the computer.  (Tr. 29)  The ALJ noted that some of the physical abilities required to perform these activities were the same as those necessary for obtaining and maintaining employment.  (*Id*.)  Kostelac reported at various physical therapy appointments in 2007 and 2008 that he was independent with activities of daily living and had hobbies that included softball, yardwork, fishing, gardening, and working out.  (Tr. 367, 388, 433, 555, 687)  The ALJ found Kostelac's activities of daily living undermined the persuasiveness of his statements regarding his alleged limitations.  (Tr. 29)

27

The Commissioner argues that Kostelac also failed to meet the requirements of Listing 1.02A because "he does not explain how the medical record shows 'chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion' as the listing requires." *See* ECF Doc. 13, Page ID# 1248 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02A).  In June and November 2007, Kostelac reported having "occasional knee pain," (Tr. 268) and stated that he had been doing a lot of walking and some kneeling and squatting.  (Tr. 267)  In March 2008, Kostelac reported that his knee bothered him intermittently and Dr. Panigutti found Kostelac had no effusion and good range of motion.  (Tr. 852)  In February 2009, Kostelac reported having some pain, but Dr. Panigutti opined that Kostelac "really ha[d] no restrictions" and should "let pain be his guide."  (Tr. 761)  This evidence supports the ALJ's finding that Kostelac's impairment did not meet the requirements of Listing 1.02(A).

Kostelac argues that he was unable to ambulate effectively, based largely on his own testimony and the opinion of Dr. Sontich.  *See* ECF Doc. 12, Page ID# 1231.  On August 29, 2012, Dr. Sontich noted that Kostelac walked with an "extraordinarily slow gait" and had pain with every step he took.  (Tr. 482)  Dr. Sontich also noted that Kostelac had secondary degenerative changes to his right knee due to overload from obesity and from not being able to fully weight bear on his left leg for five years.  (Tr. 483)  The ALJ noted that although physical examination showed a slow gait (Tr. 482, 508, 516, 528), Kostelac moved relatively well with adequate hip range of motion and ambulated without the use of an assistive device.  (Tr. 28, 352, 354)  The ALJ also noted that an occupational therapy assessment revealed that Kostelac's range of motion and strength was within functional limits throughout both his legs, with intact sensation and coordination.  (Tr. 28, 537)

Kostelac testified at the administrative hearing that he had a "hard time" walking,

28

standing, or sitting for a long time (Tr. 57), he walked with a cane or walker or leaned on a cart when shopping (Tr. 60), and that he walked with baby steps or with a shuffle.  (Tr. 60, 67)  He also testified that he "made a deal" for his mother's house because his father died and his mother owed some credit card debt.  (Tr. 60)  Kostelac stated that his mother stayed with him and did "most of the stuff" and that he hired someone to do his yard work.  (Tr. 60-61)  The Commissioner argues that Kostelac's testimony is inconsistent with his performance during occupational therapy, when he demonstrated the ability to walk on a treadmill at a walking pace and to push and carry objects for 100 feet or more at a time.  *See* ECF Doc. 13, Page ID# 1246 (citing Tr. 543, 558, 561, 631, 635, 639, 702-707, 725).  The Commissioner also noted that records from Kostelac's work hardening therapy in November 2008, indicate that Kostelac was able to walk on a treadmill for 40 minutes per day, push and pull a sled that weighed 30 pounds for 172 feet, and carry a wooden box that weighed 22.5 pounds a distance of 172 feet.  (Tr. 530-31, 725)  Indeed, the ALJ found that Kostelac's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (Tr. 27, 29)  The ALJ stated:

> While the claimant's medically determinable impairments could reasonably be expected to produce his alleged symptoms, the intensity of the claimant's symptoms are not consistent with the objective medical evidence.  The claimant did undergo surgery for the alleged impairments, which certainly suggests that the symptoms were genuine.  While that fact would normally weigh in the claimant's favor, it is offset by the fact that the record reflects that the surgery was at least partially successful in relieving the symptoms.  Treatment notes indicate the claimant had a good prognosis for improvement in his symptoms, and he was encouraged to lose weight to further manage his knee problems (Exhibits lF/2; 2F/31, 241, 395).

(Tr. 29)  Kostelac did not challenge the ALJ's finding that his statements regarding his symptoms were not entirely consistent with the evidence of record.  Further, as discussed above, the ALJ found Kostelac's activities of daily living undermined the persuasiveness of his

statements regarding his alleged limitations.  (Tr. 29)

Kostelac also argues, without any legal support, that ALJ's determination that Kostelac could walk for two hours in an eight-hour workday and should never climb ladders, ropes, or scaffolds actually supports *his* position that he could not ambulate effectively.  *See* ECF Doc. 12, Page ID# 1232.  This argument lacks merit.  Kostelac has failed to show how an ability to stand or walk for two hours in an eight-hour work somehow equates to an inability to ambulate effectively.

Kostelac argues the ALJ failed to consider whether his knee impairment equaled the severity of Listing 1.02(A).  *See* ECF Doc. 12, Page ID# 1232.  "Normally, a claimant can establish disability by demonstrating all of the medical findings listed for an impairment.  20 C.F.R. § 404.1525(c)(3)."  *Bailey v. Comm'r of Soc. Sec.*, 413 F. App'x 853, 854 (6th Cir. 2011).  "If a claimant does not have one of the findings, however, she can present evidence of some medical equivalent to that finding."  *Id*. (citing § 404.1526(b)(1)(ii)).  "To demonstrate such a medical equivalent, the claimant must present 'medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'"  *Id*. (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis in original)).  Kostelac has failed to meet his burden of showing that met or medically equaled Listing 1.02A.  Specifically, Kostelac has failed to show he had an "inability to ambulate effectively" as described in Listing § 1.00(2)(b)(2).

Kostelac argues that the ALJ erred in analyzing Listing 1.02 because she failed to consult with a medical expert regarding whether Kostelac's condition equaled the severity of the listing. *See* ECF Doc. 12, Page ID# 1232.  This argument is also without merit.  Social Security Ruling 96-6p, which was in effect when the ALJ issued her ruling, states that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on

the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."  *See* SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996).  The regulation also provides that "[t]he signature of a State agency medical . . . consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review."  *Id*.  Here both Drs. Das and Mikalov signed Disability Determination and Transmittal Forms (Tr. 77, 88) and both state agency medical consultants explicitly state that they considered whether Kostelac's condition met the requirements of Listing 1.02.  (Tr. 82, 92-93)

Kostelac's primary objection is to the sufficiency of the ALJ's discussion of Listing 1.02. But, as noted above, the court must examine the entire ALJ decision in order to assess the adequacy of the consideration of whether a claimant has proved a Listing has been met.  Here, the ALJ's entire discussion reveals a robust consideration of the entire medical record.  She concluded Kostelac had not demonstrated he met that Listing; he has not done so here either. Accordingly, Kostelac has not satisfied his burden of demonstrating the ALJ erred at Step Three in finding he did not meet the requirements of Listing 1.02.

## VII.    Recommendation

Because substantial evidence supported the ALJ's RFC determination, I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. §405(g).

Dated: September 21, 2018

Thomas M. Parker
United States Magistrate Judge

31

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).